UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STACEY MCCOY,

                Plaintiff,

           - against -

ASM GLOBAL, BROOKLYN EVENTS
CENTER, LLC d/b/a BARCLAYS CENTER,
BROOKLYN SPORTS & ENTERTAINMENT,
and ANSCHUTZ ENTERTAINMENT GROUP,
INC.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Case No.

COMPLAINT

PLAINTIFF DEMANDS A
TRIAL BY JURY

        Plaintiff Stacey McCoy ("McCoy" or "plaintiff"), by her attorneys, Vladeck, Raskin, &

Clark, P.C., complaining of defendants ASM Global, Brooklyn Events Center, LLC d/b/a Barclays

Center, Brooklyn Sports & Entertainment, and Anschutz Entertainment Group, Inc. (collectively,

"defendants" or "Barclays Center"), alleges:

NATURE OF CLAIMS

        1.     McCoy, a 58-year-old Black woman and one of the oldest employees in

management, has served as Senior Director, Guest Services at Barclays Center for more than

eight years.  McCoy has been an exemplary performer throughout her tenure, including

effectively leading large teams and making important contributions.

        2.     Throughout McCoy's tenure, however, defendants treated her and other

Black women, especially those over 40, worse than non-Black, male, and younger employees.

After McCoy raised concerns about unlawful discrimination and made several whistleblower

complaints, defendants placed her on suspension purportedly due to a baseless complaint that they later confirmed was without merit.

3.     Instead of reinstating McCoy immediately after supposedly determining the complaint was without merit, defendants issued her a written warning and told her that upon her return to work, defendants would place her on a Performance Improvement Plan or PIP.  The alleged new concerns were without basis and plainly part of the ongoing discrimination and retaliation against McCoy.

4.     As a result of defendants' mistreatment, McCoy began suffering significant stress and anxiety.  In addition, defendants' conduct exacerbated plaintiff's already existing physical health conditions.  Accordingly, McCoy was forced to take a medical leave of absence, which is ongoing.  During this leave, defendants have not paid her compensation.

5.     Plaintiff brings this action to remedy discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq. (the "ADA"); the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. (the "ADEA"); the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. (the "Executive Law"); and the Administrative Code of the City of New York § 8-107 et seq. (the "City Law").

6.     In addition, plaintiff brings this complaint, pursuant to the New York Labor Law ("NYLL") § 740 et seq., to remedy defendants' retaliation against her for reporting conduct that she reasonably believed violated a law, rule, or regulation.

7.      Plaintiff seeks injunctive and declaratory relief, compensatory, liquidated and punitive damages, and all other appropriate equitable and legal relief pursuant to Title VII, Section 1981, ADEA, ADA, the NYLL, the Executive Law, and the City Law.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over plaintiff's Section 1981, ADEA, ADA, and Title VII claims under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

9.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Executive Law, City Law, and NYLL claims because these claims closely relate to her federal claims, having arisen out from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

10.      Pursuant to § 8-502(c) of the City Law, McCoy will serve a copy of the Amended Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

11.      McCoy filed a charge of discrimination against defendants with the United States Equal Opportunity Employment Commission (the "EEOC") alleging race, gender, age, and disability discrimination and retaliation under Title VII, the ADEA, and the ADA.  The EEOC issued plaintiff a notice informing her of her right to sue.  Plaintiff thus has complied fully with the applicable statutory prerequisites.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because defendants do business in this District, and a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this District.

<u>PARTIES</u>

13.     McCoy is a 58-year-old African American woman.  At all relevant times, McCoy worked for defendants at the Barclays Center in Brooklyn.

14.     Defendant Brooklyn Events Center, LLC d/b/a Barclays Center ("defendant Barclays") owns, operates and oversees the operations of the Barclays Center arena (the "Barclays Center") located in Brooklyn, New York 11217.  Defendant Barclays is a Delaware limited liability company, is licensed to do business in the State of New York, is headquartered in Brooklyn, New York, and regularly conducts business in the Eastern District of New York.  Defendant Barclays is an employer within the meaning of the NYLL, the Executive Law, and the City Law.

15.     According to its website, defendant Brooklyn Sports & Entertainment ("defendant BSE") "manages and controls Barclays Center." Upon information and belief, defendant BSE is authorized to conduct business in the State of New York and regularly conducts business in the Eastern District of New York.   Defendant BSE maintains its headquarters in Brooklyn, New York.  Defendant BSE is an employer within the meaning of the NYLL, the Executive Law, and the City Law.

16.     Defendant Anschutz Entertainment Group, Inc. ("defendant Anschutz") is a Colorado corporation, licensed to do business in the State of New York, and regularly conducts business in the Eastern District of New York.  Defendant Anschutz maintains its headquarters in Los Angeles, California.  Defendant Anschutz is an employer within the meaning of the NYLL, the Executive Law, and the City Law.

17.     Upon information and belief, defendant ASM Global is a Delaware limited liability company, licensed to do business in the State of New York, and regularly

conducts business in the Eastern District of New York.  At all relevant times, ASM Global, which is headquartered in Los Angeles, California, has owned, operated, and/or maintained an office in Brooklyn, New York.  Defendant ASM Global is an employer within the meaning of the NYLL, the Executive Law, and the City Law.

FACTUAL ALLEGATIONS

McCoy's Professional Background

18.     McCoy has more than three decades of experience in the sports and entertainment industry, including over 15 years in Guest Services at large arenas where sporting events and other events take place.

19.     During this time, McCoy has been a dedicated employee, a tireless worker, a well-regarded team member and supervisor, and an exceptional performer.  Plaintiff earned the respect of her colleagues, direct reports, and front office executives throughout the National Basketball Association (the "NBA"). As a result, executives appointed her to, and entrusted her with, supervisory roles and positions of increasing responsibilities to oversee and lead large teams that were critical to the success of the venues.

20.     From approximately 2007 to 2015, McCoy served as a Manager, Guest Services, at the AmericanAirlines Arena (the "AAArena"), now called the Kaseya Center, in Miami, Florida. The arena is home to the NBA's Miami Heat, three-time basketball world champions.

21.     In that role, McCoy supervised all Guest Services team members for Miami Heat games and all other arena events including concerts, special and private events, premium services, and family shows. Plaintiff supervised and led the direction and activities of approximately 4,000 part-time team members and partners, which included, but was not limited

5

to, Guest Services, Event Staffing, Retail, Parking, Premium Services, Box-Office, Administrative Services, Operations, Food & Beverage, Housekeeping, and Event Security.

22.    McCoy's responsibilities included ensuring customer satisfaction, complying with best practices, and helping to maximize company profitability.  Plaintiff oversaw all Most Valuable Player ("MVP") programs and Quality Service Assurance ("QSAs") metrics for team members.

23.    During McCoy's tenure, the Miami Heat received top-tier rankings for guest services and satisfaction as compared to other NBA teams and was consistently recognized for its standards of service.  As plaintiff worked diligently and did all she could to embody the team's values, many within the organization and throughout the NBA considered her the face of the Miami Heat's service mantra.

24.    To date, Miami Heat executives, other leaders, and many full-time and part-time staff members within all sectors of the organization have expressed that they highly regard McCoy's work and respect her efforts.

25.    Before joining Barclays Center, McCoy also worked for Apollo Theatre Records, which is associated with the world-famous Apollo Theater in Harlem, as a Talent Coordinator for the Nationally Televised show "Showtime at the Apollo."  In McCoy's position, she traveled throughout the United States to conduct talent shows.  The winners of those shows were invited to appear on the world-famous Apollo Theatre stage.

26.    Before plaintiff worked in Guest Services, she also served as a high-level executive assistant at several organizations, including a non-profit dance company and the Virginia state government.

27.    McCoy also holds a Certificate in Small Business Management and Entrepreneurship from Rutgers University School of Business.

### Barclays Center

28.    Barclays Center is a world-class indoor arena and event venue that is home to the NBA's Brooklyn Nets and the WNBA's New York Liberty.

29.    According to its website, Brooklyn Sports & Entertainment Global ("BSE") "manages and operates Barclays Center." On information and belief, Joe Tsai and Clara Tsai own BSE.  On information and belief, BSE Global has a complex corporate structure and consists of multiple related entities, including Brooklyn Events Center, LLC d/b/a Barclays Center, Brooklyn Arena, LLC, and Brooklyn Sports and Entertainment, LLC.

30.    Barclays Center is also managed by ASM Global.  ASM Global is an event management and property management company with a complex corporate structure, consisting of multiple entities.

### McCoy's Successful Tenure at ASM Global

31.    McCoy began working at Barclays Center in the role of Director, Guest Services in January 2015.

32.    McCoy is employed directly by ASM Global.  On information and belief, the entities mentioned in this filing exercised control over McCoy's employment and played a role in the unlawful actions against her.

33.    For most of McCoy's employment working at Barclays Center, she has reported to Lewis Gibbons ("Gibbons"), the Assistant General Manager of Barclays.  Gibbons is a man and in his 40s. Since late 2020, Gibbons has reported to Adina Erwin ("Erwin"), General Manager of Barclays, who is also in her 40s.

A.    McCoy's Responsibilities and Accomplishments

34.    At Barclays Center, throughout McCoy's employment, she has directed and oversaw a full-time Guest Services management team.  She has led five separate units within the Guest Services department, including Supervisors, VIPs, GSRs, Usher/Ticket Takers, and Uniform Room Specialists.  McCoy has had leadership responsibilities for programming, training, development, fiscal budgets, vendor oversight, and coordinating with all BSE Global departments for event execution of Guest Services.  She has also supervised uniform room operations collection and distribution for up to 800 part-time team members, including Guest Services and security personnel.

35.    For most of McCoy's employment, her team has included two Senior Managers, two Assistant Managers, and a Coordinator.  In addition, she has led a Guest Services staff that consists of union workers, which sometimes exceeded more than 500 staff members during peak NBA season.

36.    In McCoy's capacity as a Director and head of her department, she has conducted performance reviews for both her full-time Guest Services management team and part-time Guest Services supervisors; she has built and maintained staff morale; and she has strategized and implemented staff improvements.

37.    McCoy has led Guest Services event operations for sporting events, concerts, private functions, and more.  She has ensured staff execution, including providing the highest level of customer service and compliance with laws, rules, regulations, and policies, including the Americans with Disabilities Act, NBA rules, and employee handbook policies. McCoy also has been an important part of senior leadership's Manager-On-Duty rotating team for sporting and concert events.

38.    The work has often been grueling.  In McCoy's role, McCoy manages events seating for more than 15,000 guests and up to 300 events per calendar year.  For some years, during peak seasons, McCoy has been responsible for many events in a short timeframe, including as many as 76 events in a 90-day period.

39.    Shortly after McCoy began her job working at Barclays Center, for some time, defendants significantly expanded her responsibilities. The then-Barclays General Manager Stephen Rosebrook and Barclays Center Human Resources asked plaintiff, along with other full-time department heads, to play a critical leadership role to re-open Nassau Coliseum, which had closed for renovations.  McCoy provided all Guest Services direction and leadership for the Guest Services department at Nassau Coliseum.  As a result, early in plaintiff's tenure, McCoy led Guest Services for two venues.  Plaintiff's responsibilities included overseeing two full-time management team members, both remotely and on-site, for a combined 800 part-time team members at Barclays Center and Nassau Coliseum.  McCoy ensured that her team followed best practices during events and demonstrated commitment and integrity when providing customer service at both facilities.

40.    In McCoy's role, she has regularly attended professional events on defendants' behalf.  For eight consecutive years, McCoy represented the Brooklyn Nets team at multiple NBA league-wide seminars, consortiums, and Guest Services specific activities.  During these events, McCoy shared her expertise in successfully performing her job that has included managing large numbers of union workers, executing customer service at the highest levels, and implementing rewards and recognition programs for NBA and WNBA basketball games and concerts, family shows, and other events.  Defendants have also asked McCoy to travel to arenas located throughout the country, including in Cleveland, Phoenix, Orlando, California, and many

other team buildings.  As a result, plaintiff has developed strong relationships throughout the NBA.

41.     During McCoy's tenure working for defendants, her accomplishments include successfully advocating for Barclays Center to be sensory inclusive.  McCoy led the effort to mandate that Guest Services staff participate in ongoing training about how to recognize sensory needs and ways to best communicate with guests who have those needs.  Also, on or about December 28, 2021, after McCoy had pushed for more than five years, McCoy led and executed the grand opening of a permanent sensory room.  The room is now known as the "Greyson Mathews Sensory Room."  As a result of plaintiff's leadership, Barclays Center is certified as a sensory inclusive venue and has received positive press coverage for its efforts.

42.     In addition, throughout September 2022, McCoy was responsible for a massive training effort.  She developed, organized, and led all Guest Services training courses for five separate units for approximately 500 part-time union team members.  McCoy invited executives and Human Resources leaders to speak during the training.  The training significantly improved staff performance by, for example, providing innovative and efficient ways for staff to resolve customer complaints.

B.    Strong Performance Reviews and Feedback; Merit-Based Compensation; and Promotion

43.     Due to McCoy's hard work and many successes, defendants consistently rated and acknowledged that her performance was exceptional.

44.     For example, defendants have consistently awarded her annual merit-based bonuses and pay increases.

45.     Also, since McCoy began working for defendants, McCoy has routinely received positive performance reviews that recognized her skills, experience, and success leading the largest customer-facing department within Barclays Center.

46.     For example, in McCoy's 2020 performance review, she received a "meets expectations" or above in every category. In addition, McCoy's 2020 review stated, among other things, that: "Stacey has always been great at managing her department budget. She has always be[en] a hawk of fiscal responsibility"; "There is nobody better than [McCoy at] turning a[n] unhappy customer to a happy customer"; and "Stacey's ability to empathize with guests is amazing. When she must make a service recovery call or solve a guest issue, usually she becomes best friends with the guest and make[s] sure their return experience is amazing."

47.     Also, McCoy consistently received positive oral feedback from management.  For example, on several occasions, Barclays General Manager Erwin has told McCoy that, in sum and substance, her leadership of the Guest Services team had created the most positive environment she has ever seen within this industry based on the ways that her staff executed its responsibilities for providing customer service.

48.     In addition, several BSE Global executive team members, who have been special guest speakers at McCoy's staff members briefings, have repeatedly praised her leadership abilities, extensive customer service experience, and building operations execution.

49.     Defendants have also promoted McCoy during her tenure due to her exceptional performance.  In or around 2016 or 2017, defendants promoted plaintiff from Director to Senior Director, Guest Services.

50.     Defendants have given McCoy awards for her work.  For example, the then-BSE Global CEO Brett Yormark awarded McCoy the annual employee award for

outstanding leadership and customer service delivery best practices on behalf of Brooklyn Nets/BSE Global & ASM Global.

Defendants' Discrimination and Retaliation Against McCoy

A.    Biased Treatment Against McCoy and Other Black Women and McCoy's Complaints

51.    Throughout McCoy's tenure, defendants treated older Black women employees worse than they treated non-Black, male, and younger employees.

52.    For example, during McCoy's tenure at Barclays, a White male manager in his 30s, Michael Sobieraj ("Sobieraj"), the Senior Director of Security at Barclays, repeatedly subjected plaintiff and other Black women to discriminatory mistreatment.

53.    McCoy had previously been Sobieraj's direct supervisor for several years before defendants promoted him. Even though McCoy has more seniority than Sobieraj, he frequently has been condescending and degrading to plaintiff during their discussions. Other women have raised similar concerns. Sobieraj's sexism is so offensive that multiple women employees have refused to speak with him without a witness present.

54.    Also, several Black women whom Sobieraj supervised told McCoy that he treats them worse and differently than their White male counterparts. Those women also told plaintiff that he assigns unequal workloads that favor White male employees.

55.    Throughout McCoy's employment, including as late as the summer 2022, plaintiff made multiple complaints about Sobieraj's sex and race discrimination against her. She understood that other Black women have done the same. For example, on numerous occasions, other Directors, Managers, Senior Managers, and Senior Directors raised concerns to her supervisor Gibbons and General Manager Erwin about Sobieraj's verbal abuse and ridicule of

Black workers, including plaintiff. To McCoy's knowledge, defendants took no remedial steps in response to the many complaints.

56.     Not only did defendants not address the problems, but they have provided Sobieraj benefits not offered to McCoy. Defendants rewarded Sobieraj by giving him additional authority and positions of increasing responsibility. Also, when offices became available in the executive office space, defendants assigned Sobieraj a private office there. Previously, Sobieraj had occupied a shared office on the same floor as the executive space. In contrast, even though McCoy held a senior position for longer than Sobieraj did, even though McCoy oversaw a larger team, and even though McCoy and Sobieraj held the same title, defendants did not offer plaintiff a comparable office space. McCoy's office had been located in the Barclays Center basement.

57.     McCoy is aware of other younger, non-Black male managers who have mistreated Black women and experienced no consequences. For example, Black women employees have made complaints of harassment and discrimination against Robert Wong ("Wong"), Manager, Traffic Operations, a non-Black man in his late 30s or early 40s. On one occasion, on information and belief, a part-time Black female employee complained that Wong had discriminated against her. Instead of taking steps to address the discrimination and underlying problem, defendants transferred the employee who had made the complaint.

B.     Plaintiff's Complaints About Other Violations of Laws, Rules, and/or Regulations

58.     On multiple occasions, in addition to plaintiff's unlawful discrimination concerns, she complained about defendants' conduct that she reasonably believed violated laws, rules, and/or regulations.

59.     For example, on multiple occasions, McCoy raised concerns about defendants' non-compliance with ADA requirements for accommodating customers who have

disabilities under the law.  Defendants are required, under the ADA, to reserve accessible seating for individuals with disabilities.  However, in or around spring 2022, McCoy learned that staff members were placing their friends and family, or others in exchange for money, in seats that were reserved for individuals with disabilities.  McCoy then promptly escalated her concerns to the Human Resources management team, including Laura Oliver ("Oliver"), Human Resources Director, and to Erwin, General Manager.  McCoy repeatedly raised these concerns during her mandatory Every Other Week ("EOW") meetings with Oliver and Erwin.  Despite McCoy's numerous complaints, Oliver and Erwin failed to take serious remedial action to prevent these ADA violations from continuing.  Instead, Oliver and Erwin appeared unbothered by these serious violations; on one occasion after McCoy again raised concerns about defendants' non-compliance with ADA requirements, Oliver said that McCoy was "doing too much."

60.    McCoy also repeatedly raised concerns about guests smoking marijuana during concerts held at the Barclays Center.  Plaintiff understands that it is illegal, under federal, state, and local law, as well as under Barclays Center rules, to smoke marijuana indoors.  However, defendants consistently failed to enforce these rules and permitted individuals to smoke marijuana during concerts held at the Barclays Center.  McCoy repeatedly approached Sobieraj, Senior Director of Security, and complained about the illegal conduct.  In response, Sobieraj took no action and refused to eject the guests who were blatantly violating the law and Barclays Center rules.  Instead, he told McCoy that he could not do anything because the number of smokers outnumbered him and his staff.  McCoy also raised concerns about the smokers during her EOW meetings with Oliver and Erwin.  Similar to Sobieraj, Oliver and Erwin also failed to take any action to remedy this problem.

61.     McCoy also repeatedly raised concerns about conduct she reasonably believed constituted illegal fraud and theft.  For example, McCoy complained to Oliver that Sobieraj had used his position as Senior Director of Security to intimidate Guest Services team members into giving him free wristbands.[1]  It is McCoy's understanding that Sobieraj then distributed these wristbands for his own personal gain, including to friends, family, and others in exchange for money.  Additionally, on information and belief, Sobieraj abused the defendants' family and friends discount, which is reserved for employees in limited circumstances, and relocated customers to preferred seating during events.  As a result of this misconduct, defendants lost significant revenue.  Oliver failed to take serious action in response to McCoy's numerous complaints.

62.     In response to McCoy repeatedly raising the above concerns in connection with numerous events that defendants hosted at the Barclays Center, including in September 2022, defendants failed to take action.  Instead, defendants consistently attempted to thwart McCoy's efforts to remedy her concerns.  For example, in early 2022, Erwin instructed McCoy to not further escalate her concerns to other executives or the management team.  Specifically, Erwin instructed McCoy to not speak with any member of the BSE Global Executive or management team regarding her concerns.  McCoy pushed back against Erwin's instruction.  Erwin then became visibly upset and, instead of responding to the substance of McCoy's concerns, Erwin deflected attention away by saying that she was offended that McCoy would question her.

---

[1] Wristbands permit individuals to access premium seating, including floor seats and sections designated for "VIPs."

C.      Discriminatory and Retaliatory Suspension

63.     On or about October 7, 2022, defendants suspended McCoy purportedly based on an employee complaint.  Defendants told McCoy that they were suspending her pending an investigation into the complaint of Sheila Meijas ("Meijas"), a part-time supervisor in Guest Services, who is in her 30s and friends with Oliver, Human Resources Director.  Defendants also told McCoy that Meijas had accused her of harassing her.  Defendants did not elaborate on the allegations against McCoy and did not give her a chance to respond to the purported concerns before suspending her.

64.     The suspension was baseless.   McCoy believes that defendants used Meijas's complaint as an excuse to attack her due to her race, gender, age, and protected complaints.

65.     First, from the outset, it was obvious that there was no merit to Meijas's complaint and that she made the accusations because she was upset that McCoy had criticized her for not following policy.  Shortly before September 15, 2022, McCoy's direct report, who was Meijas's supervisor, had verbally warned Meijas about problems with her performance and violations of Barclays Center rules.  McCoy was aware of these concerns and continuously discussed them at mandatory EOW meetings with Human Resources.  The Guest Services Manager on Duty that day, McCoy's direct report, Audrix Tamarez, told her that Meijas was letting guests into the arena who did not possess tickets.  Also, McCoy observed Meijas using her personal cell phone while working.  Both actions plainly violated Barclays Center policies. McCoy told Meijas that she should not be using her cell phone during active event operations. Plaintiff engaged in no conduct that remotely approached harassing behavior.

66.    Second, Meijas had a long history of misconduct.  Since 2019, numerous managers, including McCoy, and Guest Services supervisors have complained about Meijas's violations of defendants' policies and the law.  They have made complaints to, among others, Human Resources Director Oliver and Human Resources Senior Manager Sheena Thompson ("Thompson").  These complaints included concerns that Meijas was giving away wristbands to guests for premium seating without charging them and making other unauthorized adjustments to seating.  The complaints were well-founded and substantiated, including video footage capturing Meijas engaging in unlawful conduct.  Despite there being so many complaints, to the best of McCoy's knowledge, defendants took virtually no action against Meijas until 2023.[2]

67.    Third, as described above, defendants applied different standards to McCoy than they did to non-Black, younger, and male managers.  As set forth above, during McCoy's tenure working for defendants, there were numerous complaints about two non-Black, younger, male managers, Sobieraj (the Senior Director of Security) and Wong (Manager, Traffic Operations).  To McCoy's knowledge, defendants did not take corrective action against Sobieraj nor Wong even though they have been accused of engaging in far more egregious misconduct than plaintiff and even though they have been the subject of repeated discrimination and harassment complaints.  In contrast, defendants suspended McCoy based on a single complaint from an employee with a long history of misconduct.

---

[2] Five months after Meijas's false accusations against plaintiff, on information and belief, defendants terminated her employment for violating company policy by allowing guests without tickets admission to a concert and distributing premium seating wristbands to guests who did not otherwise pay for premium wristbands.  Upon information and belief, Meijas received payment under the table from these guests.  Even though defendants fired her, on information and belief, they permitted her to return to the building on the same night she was dismissed to watch an event.  McCoy understands that defendants have permitted Meijas to attend other events at Barclays Center after firing her.

68.     Fourth, defendants orchestrated the suspension to ensure McCoy's humiliation.  Defendants instructed security to walk McCoy out of the building in front of her peers.  As soon as McCoy left the building, defendants shut off McCoy's business cell phone and all other access to work communications.  However, when defendants have suspended White, younger, male employees, defendants did not shut off their business cell phones or other equipment.

69.     Moreover, defendants took approximately 35 days to complete their supposed investigation into Meijas's complaint despite their policy, and assurances to McCoy, that they would do so promptly.  During this time, McCoy had no communication with her supervisor Gibbons or her management team.  That delay alone falsely suggested to other colleagues that McCoy had engaged in gross misconduct.

70.     Fifth, defendants failed to protect McCoy's confidentiality in violation of their policies.  Defendants asserted that the investigation would remain "highly confidential" and that they would not share her suspension with other employees.  Yet, six days after defendants placed plaintiff on suspension, on or about October 13, 2022, McCoy learned that Sobieraj, the Senior Director of Security, had been discussing her suspension and employment status with other employees.  On information and belief, Sobieraj also told other employees that plaintiff had "moved on" from her job and would not be returning.  These false statements hurt McCoy's reputation among her colleagues and in the industry and, as a result, threaten to have long-term consequences for her career.

71.     McCoy complained to management about the breach of privacy and false comments about her.  Despite McCoy's concerns, defendants took no action.  As a result, on information and belief, Sobieraj continued to make negative comments about plaintiff.  Not only

18

had defendants failed to protect plaintiff's confidentiality, but they also did not discipline Sobieraj, a younger, White man, for his flagrant policy violations.

<u>Discriminatory and Retaliatory Written Warning and PIP</u>

72.    When McCoy learned about the discriminatory suspension in October 2022, she raised protected complaints.

73.    On or about October 7, 2022, McCoy met with her supervisor Gibbons and ASM Corporate Director of Human Resources Kimberly Miller ("Miller") about her suspension; McCoy had never met with Miller previously.  McCoy told them that she believed that defendants, including Sobieraj, Oliver, and Erwin, had engaged in unlawful harassment and retaliation against her.  McCoy further told them that she wanted to provide additional details about her complaints. Miller told McCoy that plaintiff would have an opportunity to discuss the matter further with her and that a full investigation would, and should be, made into plaintiff's concerns.  To McCoy's knowledge, defendants have conducted no such investigation.

74.    Instead, 35 days after defendants placed McCoy on suspension, defendants escalated their unlawful conduct against plaintiff even though they concluded that Meijas's complaint had no merit.

75.    On or about November 11, 2022, as defendants directed, McCoy attended a Microsoft Teams meeting with Miller, Erwin, and Oliver.  During the meeting, McCoy greeted each attendee, but no one responded to her.  Miller told McCoy that following their investigation defendants found no support for Meijas's complaint against her.

76.    Defendants had no choice but to reject Meijas's allegations against McCoy because they were obviously frivolous.  However, defendants, determined to build a case against plaintiff, used the 35 days to find other grounds to punish her.

77.    During the November 11, 2022, meeting, Erwin told plaintiff that based on supposedly new problems, discovered during the investigation, defendants were issuing her a written warning and that, upon her return to work, defendants would place her on a Performance Improvement Plan or PIP.  Erwin then read aloud the supposed bases for the warning and the PIP.  She stated that as part of the PIP, defendants would require plaintiff to complete multiple trainings to improve her peer relationships and her leadership.  Finally, Erwin stated that defendants had previously issued plaintiff a PIP, which was not true.  Plaintiff objected to the false performance criticisms and the assertion that plaintiff had previously received a PIP during her tenure working for defendants.  Miller conceded that McCoy had not received a PIP earlier in plaintiff's tenure and promised that she would modify the documentation to reflect this.

78.    McCoy believes the written warning, the PIP, and the mandatory trainings were further discrimination and retaliation for her protected activity.

79.    First, the allegations in the PIP are false or so exaggerated that bias is the only credible explanation.  For example:

- The PIP alleged that McCoy had made "disparaging and accusatory comments" about a younger, male Guest Services Manager, Kelvin Broughton, regarding stolen wristbands. It is a critical part of plaintiff's job to ensure that all guests have tickets and properly issued wristbands when applicable.  There is nothing improper or inappropriate about McCoy raising concerns when one of her team members violates policy and potentially the law.

- The PIP alleged that McCoy had made "inappropriate and disparaging comments" about the work ethic and integrity of a Security Coordinator, who is a 30-year-old woman. McCoy was not the only manager to complain about this employee's job performance.

Moreover, there is nothing improper about plaintiff doing her job, which included managing and critiquing staff.

- The PIP also chastised McCoy because there had supposedly been 10 hotline calls complaining about the Guest Services team. Contrary to defendants' contention, there is nothing excessive or unusual about 10 complaints when the workforce includes between 300 and 500 part-time union employees.

57.     Second, defendants failed to follow their policy in connection with the PIP. Defendants' corrective action policy provides a series of escalating steps that management should take when addressing performance concerns. Defendants did not follow any of those steps. Instead, they issued plaintiff a written warning and PIP without prior warnings for comparable conduct and then fabricated that McCoy had previously received a PIP.

58.     Third, it was clear that defendants had gone out of their way to find grounds for criticizing plaintiff's performance. Defendants plainly solicited negative feedback from employees. Two Guest Services managers told McCoy that Human Resources had pressured them to identify former employees who would likely say that she had harassed them. On information and belief, the managers told Miller that they felt intimidated and asked why she was trying to set McCoy up. To McCoy's knowledge, defendants did not treat younger, male, and/or White employees and employees who had not engaged in protected activities in this manner.

59.     Fourth, the focus of the criticisms in the PIP and written warning are inconsistent with the feedback plaintiff has received throughout her employment. For example, McCoy has repeatedly received praise for her leadership and relationships with her staff.

60.     Fifth, as set forth above, despite multiple complaints of unlawful bias and harassment, defendants have not suspended, issued written warnings, nor given PIPs to Wong and Sobieraj, both non-Black men in their 30s or early 40s.

<u>Defendants' Unlawful Conduct Forces Plaintiff to Take a Medical Leave of Absence</u>

61.     McCoy has been on a medical leave of absence since December 2, 2022. The reasons for the leave include mental health conditions, including stress and anxiety, and physical problems, including severe Chronic Obstructive Pulmonary Disease ("COPD") and emphysema.

62.     As a result of the discrimination and retaliation described above, plaintiff began suffering from significant stress and anxiety during the fall 2022.  Plaintiff's therapist recommended that she take a leave of absence, which was approved from December 2, 2022, through late February 2023.

63.     In or around early 2023, McCoy's COPD and emphysema worsened.  On information and belief, defendants' misconduct has exacerbated those medical conditions.

64.     As a result, plaintiff sought and received extensions of her medical leave. However, during the interactive process concerning McCoy's request to extend her medical leave, defendants made clear their animus towards her, including for her protected complaints and requests for accommodation.

65.     For example, even though McCoy provided medical documentation, between February and March 2023, defendants made repeated requests for additional information to substantiate her disability and accommodation request beyond the requirements of the law.

66.     Defendants demanded that McCoy "clarify the basis for [her] extended absence" because she had purportedly "not provided sufficient detail to date." They mandated that McCoy's doctor review her job description and "identify the specific job functions he believe[d] [that McCoy] [could] and [could not] perform, with or without an accommodation." By that time, McCoy's doctor had made clear that she needed a leave of absence because she could not work and was "unable to perform continuous walking" due to her "severe COPD" and an "exacerbation of that condition." Defendants' mandate that McCoy provide more support for her request was plainly intended to harass her.

67.     According to McCoy's doctors, plaintiff is incapable of returning to work and requires intensive medical treatment to manage her symptoms.

68.     During McCoy's leave of absence, defendants have not paid her any compensation, including her annual base salary and her annual bonus.

<u>Ongoing Discrimination and Retaliation</u>

69.     On or about November 17, 2022, McCoy complained via counsel about defendants' unlawful conduct.

70.     During McCoy's leave, defendants continued their discrimination and retaliation against McCoy, including by promoting a White man to oversee Guest Services and diminishing plaintiff's role and status.

71.     After McCoy's supervisor, Gibbons, resigned in March 2023, defendants promoted Sobieraj, a White man in his 30s, as an interim Senior Director to lead Guest Services. As set forth above, many team members had made discrimination complaints against Sobieraj.

72.     In addition, in or around December 2022, defendants promoted one of McCoy's direct reports, Kelvin Broughton ("Broughton"), a man in his mid-40s to Senior

Manager, Guest Services.  Defendants made no effort to discuss this change with McCoy even though she is supposedly head of Guest Services, the same department in which Broughton works.

73.    Also, on or about March 10, 2023, Oliver, Human Resources Director, sent McCoy an email stating that defendants had approved hiring new employees for some departments, including Guest Services.  Oliver told McCoy that defendants would proceed with posting and interviewing candidates for the newly created position of Director of Guest Services, which would report directly to McCoy as Senior Director of Guest Services.  She requested that McCoy participate in what she designated as "step 5" of the process, which included "[s]election of [the] prospective hire from [the] top 3 candidates."

74.    Defendants posted the job on March 13, 2023.  Defendants thereafter hired someone to fill the role.  Defendants never offered McCoy a chance to participate in the hiring process.  Moreover, defendants selected Fredderick Richardson, a man and an external candidate. In so doing, defendants bypassed a member of McCoy's Guest Services team, Nake-ya Cowan ("Cowan"), Senior Manager, a Black woman.  On information and belief, Cowan had also made protected complaints against Sobieraj for biased treatment.  Even though Cowan has the required experience and qualifications and even though she applied for the job, on information and belief, defendants did not even interview her.

75.    After the changes described above, McCoy understands that the Guest Services management team complained that Sobieraj was mistreating them.  Despite the complaints, defendants once again took no action against Sobieraj.

FIRST CAUSE OF ACTION
NYLL – Whistleblower Retaliation

76.     Plaintiff repeats and realleges paragraphs 1 through 75 as if fully set forth herein.

77.     By the acts and practices described above, defendants violated NYLL when they retaliated against plaintiff because she reported conduct that she reasonably believed violated a law, rule, or regulation.

78.     Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' retaliatory practices.

SECOND CAUSE OF ACTION
Title VII – Discrimination

79.     Plaintiff repeats and realleges paragraphs 1 through 78 as if fully set forth herein.

80.     By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of her employment on the basis of her race and gender in violation of Title VII.

81.     Defendants engaged in these discriminatory practices with malice and with reckless indifference to plaintiff's rights protected under federal law.

82.     Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, and mental anguish, humiliation and damage to reputation, as a result of defendants' discriminatory practices unless and until this Court grants relief.

## THIRD CAUSE OF ACTION
### Section 1981 – Discrimination

83.     Plaintiff repeats and realleges paragraphs 1 through 82 as if fully set forth herein.

84.     By the acts and practices described above, defendants have discriminated against plaintiff on the basis of her race in violation of Section 1981.

85.     Defendants acted intentionally and with malice and/or reckless indifference to plaintiff's statutorily protected rights.

86.     Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' discriminatory practices.

## FOURTH CAUSE OF ACTION
### ADEA – Discrimination

87.     Plaintiff repeats and realleges paragraphs 1 through 86 as if fully set forth herein.

88.     By the acts and practices described above, defendants have discriminated against plaintiff on the basis of her age in violation of the ADEA.

89.     Defendants acted intentionally and with malice and/or reckless indifference to plaintiff's statutorily protected rights.

90.     Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' discriminatory practices.

## FIFTH CAUSE OF ACTION
### ADA – Discrimination

91.    Plaintiff repeats and realleges paragraphs 1 through 90 as if fully set forth herein.

92.    By the acts and practices described above, defendants have discriminated against plaintiff on the basis of her age in violation of the ADA.

93.    Defendants acted intentionally and with malice and/or reckless indifference to plaintiff's statutorily protected rights.

94.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' discriminatory practices.

## SIXTH CAUSE OF ACTION
### Executive Law – Discrimination

95.    Plaintiff repeats and realleges paragraphs 1 through 94 as if fully set forth herein.

96.    At all times relevant to the cause of action, defendants employed plaintiff within the meaning of the Executive Law.

97.    By the acts and practices described above, defendants have discriminated against plaintiff on the basis of her race, age, gender, and disability in violation of the Executive Law.

98.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' discriminatory practices.

## SEVENTH CAUSE OF ACTION
### City Law – Discrimination

99.    Plaintiff repeats and realleges paragraphs 1 through 98 as if fully set forth herein.

100.    At all times relevant to the cause of action, defendants employed plaintiff within the meaning of the City Law.

101.    By the acts and practices described above, defendants have discriminated against plaintiff on the basis of her race, age, gender, and disability in violation of the City Law.

102.    Defendants' conduct showed willful and/or wanton negligence, recklessness, and conscious disregard for plaintiff's statutorily protected rights under the City Law. Defendants' conduct was reckless to the degree it demonstrated conscious disregard for plaintiff's statutorily protected rights.

103.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' discriminatory practices.

## EIGHTH CAUSE OF ACTION
### Section 1981 – Retaliation

104.    Plaintiff repeats and realleges paragraphs 1 through 103 as if fully set forth herein.

105.    By the acts and practices described above, defendants have retaliated against plaintiff for her protected activities in violation of Section 1981.

106.    Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

107.    As a result of defendants' retaliatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish,

28

emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## NINTH CAUSE OF ACTION
### Title VII – Retaliation

108.    Plaintiff repeats and realleges paragraphs 1 through 107 as if fully set forth herein.

109.    By the acts and practices described above, defendants have retaliated against plaintiff for her protected activities in violation of the ADA.

110.    Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

111.    As a result of defendants' retaliatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## TENTH CAUSE OF ACTION
### ADEA – Retaliation

112.    Plaintiff repeats and realleges paragraphs 1 through 111 as if fully set forth herein.

113.    By the acts and practices described above, defendants have retaliated against plaintiff for her protected activities in violation of the ADEA.

114.    Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

115.    As a result of defendants' retaliatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish,

emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## ELEVENTH CAUSE OF ACTION
### ADA – Retaliation

116.    Plaintiff repeats and realleges paragraphs 1 through 115 as if fully set forth herein.

117.    By the acts and practices described above, defendants have retaliated against plaintiff for her protected activities in violation of the ADA.

118.    Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

119.    As a result of defendants' retaliatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## TWELFTH CAUSE OF ACTION
### Executive Law – Retaliation

120.    Plaintiff repeats and realleges paragraphs 1 through 119 as if fully set forth herein.

121.    At all times relevant to the cause of action, defendants employed plaintiff within the meaning of the Executive Law.

122.    By the acts and practices described above, defendants have retaliated against plaintiff due to her protected activities in violation of the Executive Law.

123.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' discriminatory practices.

## THRITEENTH CAUSE OF ACTION
### City Law – Retaliation

124.    Plaintiff repeats and realleges paragraphs 1 through 123 as if fully set forth herein.

125.    At all times relevant to the cause of action, defendants employed plaintiff within the meaning of the City Law.

126.    By the acts and practices described above, defendants have retaliated against plaintiff for her protected activities in violation of the City Law.

127.    Defendants' conduct showed willful and/or wanton negligence, recklessness, and conscious disregard for plaintiff's statutorily protected rights under the City Law. Defendants' conduct was reckless to the degree it demonstrated conscious disregard for plaintiff's statutorily protected rights.

128.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' discriminatory practices.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a.    declaring that the acts and practices complained of herein are in violation of Title VII, the ADEA, the ADA, the NYLL, Section 1981, the Executive Law, and the City Law;

b.    enjoining and permanently restraining these violations of the NYLL, Title VII, the ADEA, the ADA, Section 1981, the Executive Law, and the City Law;

       c.       directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff;

       d.       directing defendants to place plaintiff in the position she would have occupied but for defendants' discriminatory and retaliatory conduct, and making her whole for all earnings and other benefits she would have received but for defendants' discriminatory treatment, including, but not limited to, wages, bonuses, pension, stock options and other lost benefits;

       e.       directing defendants to pay plaintiff compensatory damages, including damages for loss of earning potential, emotional distress, humiliation, and pain and suffering;

       f.       directing defendants to pay plaintiff punitive damages as provided by applicable law;

       g.       awarding plaintiff reasonable attorneys' fees and costs;

       h.       awarding plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award; and

       i.       granting such other and further relief as the Court deems necessary and proper.

<u>DEMAND FOR A TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a

trial by jury in this action.

Dated:  New York, New York
          October 7, 2024

                                          VLADECK, RASKIN & CLARK, P.C.



                              By:        */s/ Jeremiah Iadevaia*

                                     Jeremiah Iadevaia
                                     Attorneys for Plaintiff
                                     111 Broadway, 1505
                                     New York, New York 10006
                                     (212) 403-7300